**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 405-7190
Email: jpafiti@pomlaw.com

*Attorneys for Plaintiff*

*- additional counsel on signature page -*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN LEWIS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>LYFT, INC., LOGAN GREEN, JOHN ZIMMER, BRIAN ROBERTS, PRASHANT (SEAN) AGGARWAL, BEN HOROWITZ, VALERIE JARRETT, DAVID LAWEE, HIROSHI MIKITANI, ANN MIURA-KO, and MARY AGNES (MAGGIE) WILDEROTTER,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Kevin Lewis ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiffs undersigned attorneys, alleges the following based upon personal knowledge, as to Plaintiff and Plaintiffs own acts, and upon information and belief, as to all other matters, based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings, analyst and media reports, and other commentary analysis.  Plaintiff's investigation into the matters alleged herein is continuing and many relevant facts are known only to, or are exclusively within the custody and control of, the Defendants (defined below).  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for formal discovery.

**NATURE AND SUMMARY OF THE ACTION**

1.      Plaintiff brings this action under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") against:  (1) Lyft, Inc. ("Lyft" or the "Company"); and (2) certain of the Company's senior executives and directors who signed the registration statement filed with the SEC on Form S-1 (File No. 333-229996) declared effective on March 28, 2019 (the "Registration Statement"), in connection with the Company's initial public offering (the "IPO" or "Offering").  Plaintiff alleges that the Registration Statement and accompanying prospectus for the IPO (collectively, the "Offering Documents"), contained materially incorrect or misleading statements and/or omitted material information that was required by law to be disclosed.  Defendants are each strictly liable for such misstatements and omissions therefrom and are so liable in their capacities as signers of the Registration Statement.

2.      Lyft is a ridesharing company.  Beginning in 2012, Lyft sought to change transportation by launching its peer-to-peer marketplace for on-demand ridesharing.  Today, through its technology platform, Lyft operates a scaled network of drivers and riders, affording riders the ability to select the mode of transportation suited to their specific needs.

3. In November 2018, following its $251 million acquisition of Bikeshare Holdings LLC ("Motivate"), the largest bikeshare operator in North America with a 2017 revenue of approximately $100 million, Lyft added bikes to its suite of services. According to its Form S-1 filed on March 1, 2019 with the SEC, Lyft acquired Motivate to "establish a solid foothold in the bikeshare market and offer access to new transportation options on the Lyft Platform." Pursuant to its agreement, Lyft acquired Motivate's technology and corporate functions, including its city contracts (*e.g.*, New York City's "Citi Bike").

4. On March 28, 2019, in what appeared to be a race against the world's number-one ride share company, Uber Technologies, Inc. ("Uber"), to be first to list its shares on a public exchange, Lyft conducted an IPO through which it offered 32.5 million shares to the public at a price of $72.00 per share for anticipated total proceeds to Lyft of over $2.275 billion.

5. According to the Offering Documents filed in connection with the IPO, Lyft estimated that its ridesharing marketplace "is available to over 95% of the U.S. population, as well as in select cities in Canada." Lyft also asserted that its "U.S. ridesharing market share was 39% in December 2018, up from 22% in December 2016."

6. Lyft's focus on its market share gain and position were key selling points to IPO investors, which were reiterated in a CNBC interview with Lyft co-founders, Defendants Logan Green ("Green") and John Zimmer ("Zimmer"), on the same day as the Company's IPO.

7. Unbeknownst to investors, however, the Registration Statement's representations were materially inaccurate, misleading, and/or incomplete because they failed to disclose, *inter alia*, that: (1) more than 1,000 of the bicycles in Lyft's rideshare program suffered from safety issues that would lead to their recall; (2) Lyft's claimed ridesharing market position was overstated; (3) Lyft's drivers were losing their incentivize to drive for Lyft; and (4) Lyft failed to warn investors that a labor disruption

could affect its operations. Accordingly, the price of the Company's shares was artificially and materially inflated at the time of the Offering.

8. As these true facts emerged in the wake of the Offering, the Company's shares fell sharply to under $57.00 on April 15, 2019.

9. By this action, Plaintiff, on behalf of himself and the other Class (defined below) members, who also acquired the Company's shares pursuant or traceable to the Offering, now seeks to obtain a recovery for the damages suffered as a result of Defendants' violations of the Securities Act, as alleged herein.

10. The claims asserted herein are purely strict liability and negligence claims. Plaintiff expressly eschews any allegation sounding in fraud.

## JURISDICTION AND VENUE

11. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v).

13. Venue is proper in this Judicial District pursuant to Section 28 U.S.C. § 1391(b) as the alleged misleading public filings and press releases entered this district and the Company's headquarters are located in this district.

14. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

# PARTIES

## A. Plaintiff

15. Plaintiff purchased shares of the Company's common stock that were issued pursuant and/or traceable to the Registration Statement and Offering and was damaged thereby.

## B. Defendants

16. Defendant Lyft is a transportation network company based in San Francisco, California, which operates throughout the United States and in parts of Canada. Through the Lyft mobile platform, Lyft operates a peer-to-peer marketplace for on-demand ridesharing, including access to motor vehicles, shared bikes, and shared scooters. Lyft's shares are listed and trade on the Nasdaq Global Select Market under the ticker symbol "LYFT."

17. At the time of the IPO, Defendant Green, who co-founded the Company with Defendant Zimmer, was serving as Chief Executive Officer and as a director on Lyft's board of directors (the "Board"). Defendant Green participated in the preparation of and signed the Registration Statement.

18. At the time of the IPO, Defendant Zimmer, who co-founded the Company with Defendant Green, was serving as President and Vice Chairman of the Board. Defendant Zimmer participated in the preparation of and signed the Registration Statement.

19. At the time of the IPO, Defendant Brian Roberts ("Roberts") was serving as Chief Financial Officer. Defendant Roberts participated in the preparation of and signed the Registration Statement.

20. At the time of the IPO, Defendant Prashant (Sean) Aggarwal ("Aggarwal") was serving as Chairman of the Lyft Board. Defendant Aggarwal participated in the preparation of and signed the Registration Statement.

21. At the time of the IPO, Defendant Ben Horowitz ("Horowitz") was a director on the Lyft Board. Defendant Horowitz participated in the preparation of and signed the Registration Statement.

22. At the time of the IPO, Defendant Valerie Jarrett ("Jarrett") was a director on the Lyft Board. Defendant Jarrett participated in the preparation of and signed the Registration Statement.

23. At the time of the IPO, Defendant David Lawee ("Lawee") was a director on the Lyft Board. Defendant Lawee participated in the preparation of and signed the Registration Statement.

24. At the time of the IPO, Defendant Hiroshi Mikitani ("Mikitani") was a director on the Lyft Board. Defendant Mikitani participated in the preparation of and signed the Registration Statement.

25. At the time of the IPO, Defendant Ann Miura-Ko ("Miura-Ko") was a director on the Lyft Board. Defendant Miura-Ko participated in the preparation of and signed the Registration Statement.

26. At the time of the IPO, Defendant Mary Agnes (Maggie) Wilderotter ("Wilderotter") was a director on the Lyft Board. Defendant Wilderotter participated in the preparation of and signed the Registration Statement.

27. Defendants Green, Zimmer, Roberts, Aggarwal, Horowitz, Jarrett, Lawee, Mikitani, Miura-Ko, and Wilderotter are collectively referred to herein as the "Individual Defendants."

28. Lyft and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

29. The Offering Documents used to effectuate Lyft's IPO were false and misleading in that they misled investors with respect to the Company's actual national market share and safety issues regarding the Company's bikesharing business, all of which were known to, but concealed by, Defendants at the time of the IPO.

30. The Registration Statement made the following representations concerning Lyft's business and market share:

>Our values, brand, innovation and focused execution have driven significant growth in market share and in the number of users on our platform. As ridesharing becomes more mainstream, we believe that users are increasingly choosing a ridesharing platform based on brand affinity and value alignment. ***Our U.S. ridesharing market share was 39% in December 2018, up from 22% in December 2016.*** This growth comes from both new drivers and riders as well as increased ride frequency. For the quarter ended December 31, 2018, we had 18.6 million Active Riders and over 1.1 million drivers who provided rides.[1]
>
>Our revenue was $343.3 million, $1.1 billion and $2.2 billion in 2016, 2017 and 2018, respectively, representing year-over-year growth of 209% from 2016 to 2017 and 103% from 2017 to 2018.

[Emphasis added.]

31.     The Registration Statement reaffirmed these representations by making the following statements concerning Lyft's business and market share:

>We operate in a competitive market and must continue to compete effectively in order to grow, improve our results of operations and achieve and maintain long-term profitability. We are one of the largest and fastest-growing multimodal transportation networks in the United States and Canada. Our main ridesharing competitors in the United States and Canada include Uber, Gett (Juno) and Via. Our main competitors in the bike and scooter sharing market include Uber (Jump), Lime and Bird. We also compete with taxi cab and livery companies, traditional automotive manufacturers and developers of autonomous vehicle technology that may compete with us in the future, including Alphabet (Waymo). ***Although we face intense competition, our values, brand, innovation and focused execution have driven increased ridesharing market share in the United States, growing from 22% in December 2016 to 39% in December 2018.***

[Emphasis added.]

32.     The Registration Statement also addressed Motivate, making the following representations concerning the purpose behind the Company's acquisition of the bikesharing outfit:

>We are investing in the expansion of our scooter network and have expanded into shared bikes with our recent acquisition of Motivate, the largest bike sharing platform in the United States.

\* \* \*

---

[1] According to the Registration Statement, "Active Riders" is defined as "all riders who take at least one ride on [Lyft's] multimodal platform through the Lyft app during a quarter." Importantly, for Lyft's "acquired businesses, including Motivate, only riders that have taken a ride or rented a bike or scooter through [the] Lyft app during the quarter will count as an Active Rider."

On November 30, 2018 (the Closing Date), the Company completed its acquisition of Motivate, a New York-headquartered bikeshare company, for cash consideration of $250.9 million. ***The purpose of the acquisition is to establish a solid foothold in the bikeshare market*** and offer access to new transportation options on the Lyft Platform.

\* \* \*

Lyft bikes are standard and electric pedal-assist bicycles. ***Through our acquisition of Motivate, the largest bike sharing platform in the United States, we are well-positioned to lead sustainable mobility in the markets we serve.*** This platform brings expertise in managing bike share systems in partnership with cities and local governments across the country, currently operating in nine major cities across the United States. ***In 2017, there were more than 35 million bike share trips in the United States, of which 74% were on Motivate systems.***

[Emphasis added.]

33. The Registration Statement also addressed Lyft's treatment of its drivers, stating, in relevant part:

Driver-Centric. We focus on providing drivers with a best-in-class experience. From day one, we offered in-app tipping to help drivers maximize earnings. Drivers have access to 24/7 support and earnings tools as well as career coaches, education resources and flexible car rental programs. We are also making significant investments in Driver Hubs, our driver-centric service centers and community spaces, to assist drivers on and off the road. We also introduced subscription offerings to encourage greater ride frequency, thereby providing more earning opportunities for drivers.

\* \* \*

Personalized, Data-Driven Insights. We have collected data from over one billion rides and over ten billion miles driven to inform our machine learning algorithms and data science engines. We leverage insights from this data to improve the product experience for riders by presenting them with personalized transportation options. Our data insights also allow us to anticipate market specific demand, enabling us to create customized incentives for drivers in local markets. We enable riders to optimize routes across multiple modes of transportation which we believe provides us with a significant advantage over single modality providers.

\* \* \*

Ridesharing Marketplace. Our core offering since 2012 connects drivers with riders who need to get somewhere. The scale of our network enables us to predict demand and proactively incentivize drivers to be available for rides in the right place at the right time. This allows us to optimize earning opportunities for drivers and convenience for riders, creating sustainable value to both sides of our marketplace.

\* \* \*

Key Benefits to Drivers

We work hard to serve the community of drivers on our platform, empowering them to be their own bosses and providing them the opportunity to focus their time on what matters most. Key benefits to drivers on our platform include:

• Flexibility. Whether someone is fully-employed or retired, having the flexibility to work when they choose can make a big difference. Drivers can sign up for Lyft easily from their device of choice. After background and safety checks are completed and their application is approved, they can start earning. Drivers can choose to get paid almost instantly with Express Pay or choose to have their earnings deposited on a weekly basis. In select cities, drivers who do not own a vehicle can get a flexible car rental with our Express Drive program in partnership with Hertz, Flexdrive and Avis Budget Group.

• Income. Drivers have earned over $10 billion on our platform since inception. Our predictive technology around ride volume and demand enables us to share key information with drivers about when and where to drive in order to maximize their earnings on a real-time basis.

• Trust and Safety. Safety is our top priority, and establishing a community built on trust and safety is paramount to our success. We were the first to provide up to $1 million in commercial automobile liability insurance for Transportation Network Company, or TNC, delivers from the moment they are matched with a rider until that rider is dropped off. We also provide drivers support in emergency situations and accidents. In addition, all riders using the Lyft app must provide valid payment credentials and a phone number for identification purposes prior to requesting a ride. All transactions are processed through our platform, so drivers do not need to worry about carrying cash.

• Extensive Support. We invest heavily in driver support and are continuously innovating to improve driver experiences. Our Driver Hubs and field locations in major cities serve as gathering places and offer in person support and a personal connection to Lyft employees. In addition, drivers have access to 24/7 support and earnings tools, as well as career coaches, education resources and other support to meet their personal goals.

\* \* \*

Our Growth Strategy

\* \* \*

Invest in Technology to Strengthen Our Network and Increase Efficiency. Our investments in proprietary technologies and predictive analytics leverage insights derived from the rich set of data generated by our platform. These investments allow us to deliver an affordable, convenient and high-quality experience for our riders and increase the earnings of drivers. Our investments in mapping, routing, payments, in-app navigation and matching technologies are key to integrating technology and leveraging

8
CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

data science into our platform in order to increase the efficiency of our platform and improve safety. In addition, we are investing in autonomous technology, which we believe will be a critical part of the future of transportation.

\* \* \*

Optimizing Marketplace Supply

Once drivers sign up and begin driving, our predictive analytics and dynamic pricing algorithms help us to align driver incentives to encourage drivers to be available, at the right times, in areas of high demand. This helps provide drivers with potentially higher earning opportunities by allowing them to maximize their earnings per hour, which can elevate driver satisfaction, increase supply in peak hours and improve the overall efficiency of the marketplace.

34.     The foregoing statements were materially inaccurate, misleading, and/or incomplete because they failed to disclose, *inter alia*, that: (1) more than 1,000 of the bicycles in Lyft's rideshare program suffered from safety issues that would lead to their recall; (2) Lyft's claimed ridesharing market position was overstated; (3) Lyft's drivers were losing their incentivize to drive for Lyft; and (4) Lyft failed to warn investors that a labor disruption could affect its operations.

35.     The true facts regarding the Offering Documents began to emerge after the Offering. In the immediate wake of the Offering, Lyft's stock price declined as investors raised concerns that Lyft's reported market share may have been overstated. Investor concerns were exacerbated on April 10, 2019, by reports that Uber, Lyft's much larger competitor, was preparing to file for an initial public offering.

36.     Then, on April 11, 2019, after the close of the market, Uber filed its Form S-1 with the SEC. Uber's Form S-1 claimed a market share of greater than 65% in the United States and Canada, a claim that further undermined Lyft's purported claim of 39% market share.

37.     Further, on April 15, 2019, the *New York Times* reported that Citi Bike was taking out of service 1,000 bicycles in New York, and more in Washington, D.C., and San Francisco, California, in the wake of dozens of reported injuries and safety concerns. This resulted in a 6.3% drop in the Company's share price on April 15, 2019.

38. In fact, as reported by the *Wall Street Journal* on April 16, 2019, roughly 15% of the Company's fleet of bikes were pulled.

39. Separately, in the lead-up to the IPO, to increase the Company's reported revenues and profits, Lyft had caused its ridesharing app to begin charging higher "surge pricing" more often than it had previously been doing, and caused the app to retain a higher portion of the additional revenue without sharing a proportionate share with drivers. This led to decreased payment to drivers, causing them to lose incentive to drive for Lyft, and potentially damaging the business on a long-term basis. As a result, Lyft's business metrics, growth potential, and financial prospects were not as strong as presented in the Offering Documents.

40. The Registration Statement also failed to warn investors of the potential for a labor disruption notwithstanding the fact that on Monday, March 25, 2019, Lyft's drivers in Los Angeles had gone on strike for twenty-five hours.

41. For the foregoing reasons, in addition to being false and misleading because of affirmative false and misleading statements and omissions, Lyft's Offering Documents were also misleading for failing to disclose the truth about the Company's market share, and how and why its bikesharing business was not performing, in violation of 17 C.F.R. § 229.303 ("Item 303"). The Offering Documents also failed to adequately describe the risks posed thereby in violation of 17 C.F.R. § 229.503 ("Item 503"). Further, Defendants' omissions rendered false and misleading the Offering Documents' many references to known risks that "*if*" occurring "*might*" or "*could*" affect the Company. [Emphasis added.] In truth, the purported "risks" were already materializing at the time of the Offering.

42. In response to these revelations, the Company's shares fell sharply to around $57.00.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

43. Plaintiff brings this action as a class action on behalf of a class consisting of all those who purchased the Company's common stock pursuant or traceable to the Company's Offering and Registration Statement and who were damaged thereby (the "Class"). Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which Defendants have or had a controlling interest.

44. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the proposed Class. The members of the proposed Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using customary forms of notice that are commonly used in securities class actions.

45. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct.

46. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

47. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    (a)    whether the federal securities laws were violated by Defendants' acts, as alleged herein;

    (b)    whether the Offering Documents contained materially false and misleading statements and omissions; and

(c) to what extent Plaintiff and the other members of the Class have sustained damages and the proper measure of such damages.

48. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FIRST CLAIM

### Violations of Section 11 of the Securities Act
### Against All Defendants

49. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

50. This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against each of the Defendants.

51. The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

52. The Company is the issuer of the securities purchased by Plaintiff and the Class. As such, the Company is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate.

53. The Individual Defendants each signed the Registration Statement. As such, each is strictly liable for the materially inaccurate statements contained in the Registration Statement and the failure of the Registration Statement to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements

contained in the Registration Statement and ensure that they were true and accurate, there were no omissions of material facts that would make the Registration Statement misleading, and the document contained all facts required to be stated therein. In the exercise of reasonable care, the Individual Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material fact necessary to make the statements made therein not misleading. Accordingly, the Individual Defendants are liable to Plaintiff and the Class.

54. By reasons of the conduct herein alleged, each Defendant violated Section 11 of the Securities Act.

55. Plaintiff acquired the Company's common stock pursuant or traceable to the Registration Statement and without knowledge of the untruths and/or omissions alleged herein. Plaintiff sustained damages, and the price of the Company's common stock declined substantially due to material misstatements in the Registration Statement.

56. This claim is brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Offering.

57. By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under Section 11, as measured by the provisions of Section 11(e), from the Defendants and each of them, jointly and severally.

## SECOND CLAIM

**Violations of Section 15 of the Securities Act**
**Against the Individual Defendants**

58. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

59. This claim is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class, against the Individual Defendants.

60. The Individual Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act. By reason of their ownership interest in, senior management positions at, and/or directorships held at the Company, as alleged above, these Defendants invested in, individually and collectively, had the power to influence, and exercised same over the Company to cause it to engage in the conduct complained of herein.

61. By reason of such wrongful conduct, the Individual Defendants are liable pursuant to Section 15 of the Securities Act. As a direct and proximate result of the wrongful conduct, Class members suffered damages in connection with their purchases of the Company's shares.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Certifying this action as a class action, appointing Plaintiff as a Class Representative, and appointing Plaintiff's counsel Class Counsel;

B. Awarding damages in favor of Plaintiff and the Class against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding rescission, disgorgement, or such other equitable or injunctive relief as deemed appropriate by the Court.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 31, 2019

                                                Respectfully submitted,

                                                **POMERANTZ LLP**

                                                By: */s/ Jennifer Pafiti*
                                                Jennifer Pafiti (SBN 282790)
                                                468 North Camden Drive
                                                Beverly Hills, CA 90210

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Telephone: (818) 532-6499
E-mail: jpafiti@pomlaw.com

**POMERANTZ, LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile:  (212) 661-8665
E-mail: jalieberman@pomlaw.com
E-mail: ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South LaSalle Street
Suite 3505
Chicago, Illinois  60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1. I, **Kevin Lewis**, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed a Complaint against LYFT Inc. ("LYFT" or the "Company"), and authorize the filing of a comparable complaint on my behalf.

3. I did not purchase or acquire LYFT securities at the direction of plaintiffs counsel, or in order to participate in any private action arising under the Securities Act or Exchange Act.

4. I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired LYFT securities during the class period, including providing testimony at deposition and trial, if necessary. I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5. To the best of my current knowledge, the attached sheet lists all of my transactions in LYFT securities during the Class Period as specified in the Complaint.

6. During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7. I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8. I declare under penalty of perjury that the foregoing is true and correct.

Executed  04-23-2019
                (Date)

_____
(Signature)

Kevin Lewis
(Type or Print Name)

**Lyft, Inc. (LYFT)**                                                                                             **Lewis, Kevin**

## List of Purchases and Sales

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| 4/11/2018 | Purchase | 10 | $61.0800 |